JAMES McNAIR THOMPSON
SBN 67807
LAW OFFICES OF JAMES McNAIR THOMPSON
PO BOX 636
LOS GATOS CA 95031
(408) 358-6047
Attorney for defendant Ibrahim

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No.: CR – 11—00811 – EMC |
| | ) |
| Plaintiff, | ) DEFENDANT IBRAHIM'S MOTION |
| | ) FOR NEW TRIAL |
| vs. | ) (RULE 33) |
| | ) |
| HASAN IBRAHIM, | ) DATE: AUGUST 21, 2013 |
| | ) TIME: 2:30 P.M. |
| Defendant. | ) DEPT: COURTROOM 5, 17TH FLOOR |
| | ) HON. EDWARD M. CHEN, |
| | PRESIDING |

## Contents

I.  INTRODUCTION ........................................................................................... 1

II.  RULE 33 ..................................................................................................... 1

III.  INSTRUCTION 33 IMPROPERLY INSTRUCTED THE JURORS THAT, AS A MATTER OF LAW, EACH SUBSTANCE ALLEGED IN THE FIRST NINE COUNTS TO BE A "DESTRUCTIVE SUBSTANCE" WAS IN FACT A DESTRUCTIVE SUBSTANCE. ................................................................... 1

  A.  THE ALLEGATIONS OF COUNTS 1 THROUGH 9 ......................................... 1

  B. THE STATUTE INSOFAR AS IT WAS CHARGED ........................................... 2

  C.  INSTRUCTION 33 DIRECTED THE JURORS TO FIND THAT EACH CHEMICAL LISTED IN COUNTS ONE THROUGH NINE WAS IN FACT A DESTRUCTIVE SUBSTANCE IN VIOLATION OF THE DEFENDANT'S RIGHTS UNDER THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION ................................................................. 2

IV. THE INSTRUCTIONS ON COUNTS 1 THROUGH 9 FAILED TO ADEQUATELY DEFINE "LIKELY TO ENDANGER THE SAFETY OF ANY SUCH AIRCRAFT" .................................................................................. 3

  A.  THE ROLE OF "LIKELY TO ENDANGER THE SAFETY OF ANY SUCH AIRCRAFT" IN DEFINING A VIOLATION OF 18 U.S.C. §32(a)(2) ..................... 3

  B.  INSTRUCTIONS DEFINING "WILLFULLY" IN THE CONTEXT OF 18 U.S.C. §32(a)(2) WERE ERRONEOUS ................................................... 5

    1. INTRODUCTION .................................................................................. 5

2. THE PARTIES' PROPOSED INSTRUCTIONS ..................................................... 5

3. THE COURT'S INSTRUCTION ....................................................................... 6

4. THE COURT'S REASON FOR REJECTING THE DEFENDANT'S
PROFFERED INSTRUCTION CANNOT BE RECONCILED WITH THE
COURT'S REASON FOR REJECTING THE GOVERNMENT'S PROPOSED
INSTRUCTION ................................................................................................. 7

5. THE NECESSITY TO DEFINE "WILLFULLY" AS INCLUDING
KNOWLEDGE THAT THE SUBSTANCE WOULD LIKELY ENDANGER THE
SAFETY OF AN AIRCRAFT IS EVEN MORE PREJUDICIAL WHERE, AS
HERE, THE DEFENDANT IS CHARGED UNDER 18 U.S.C. §32(a)(8) WITH
AN ATTEMPT .................................................................................................. 9

C. THE INSTRUCTION DEFINING "ENDANGER" WAS ERRONEOUS ........... 9

D. THE DEFENDANT'S PROFFERED DEFINITION OF "LIKELY" SHOULD
HAVE BEEN GIVEN ....................................................................................... 12

E. EACH INSTRUCTIONAL ERROR COMPELS GRANTING A NEW TRIAL
ON COUNTS 1 THROUGH 9, AND THE COMBINED EFFECT OF THE
ERRORS COMPELS GRANTING A NEW TRIAL ON COUNTS 1 THROUGH 9
......................................................................................................................... 12

IV. PROSECUTORIAL MISCONDUCT COMPELS THE GRANTING OF A
MOTION FOR NEW TRIAL ON ALL COUNTS ..................................................... 12

A. INTRODUCTION ............................................................................................ 12

B. THE PROSECUTION'S CONFLATION OF MEDCHEM AND DEFENDANT
IBRAHIM WAS INTENTIONAL ...................................................................... 14

C.  THE GOVERNMENT PERSISTED IN MISCHARACTERIZING EXHIBIT 524 .................................................................................................... 15

D.  THE GOVERNMENT'S EFFORT TO CONFLATE MEDCHEM AND DEFENDANT IBRAHIM, AND MISCHARACTERIZE EXHIBIT 524, WAS MISCONDUCT ................................................................................................ 16

V.  FAILURE TO GRANT THE DEFENSE A REASONABLE CONTINUANCE REQUIRES THE GRANTING OF A NEW TRIAL ON ALL COUNTS ................... 17

VI.  THE COMBINATION OF UNAUTHORIZED *EX PARTE* COMMUNICATIONS AND THE DENIAL OF DISCOVERY ON THE QUESTION OF SELECTIVE OR VINDICTIVE PROSECUTION REQUIRES A NEW TRIAL IN THE INTEREST OF JUSTICE ............................................................................................... 19

VII.  CONCLUSION ............................................................................... 20

**Cases**

*Cargle v. Mullin*, 317 F.3d 1196, 1218 (10th Cir. 2003) ............................................ 16

*Berger v. United States*, 295 U.S. 78, 88  (1935) ................................................... 16

*Boise Cascade Corp. v. EPA*, 942 F.2d 1427, 1432 (9th Cir. 1991) ........................... 8

*Cheney v. Washington*, 614 F.3d 987 (9th Cir. 2010) .............................................. 16

*Hall v. U.S.*, 419 F.2d 582, 587 (5th Cir. 1969) .................................................... 16

*In re Winship*, 397 U.S. 358, 364 (1970) ............................................................. 3

*Miller v. Pate* 386 U.S. 1 (1966) ....................................................................... 16

*Sechrest v. Ignacio*, 549 F.3d 789, 808 (9th Cir. 2008) ......................................... 16

*Stirone v. United States*, 361 U.S. 212 (1960) ..................................................... 16

*Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993) ................................................................. 3

*United States v. Blueford*, 312 F.3d 962, 968 – 969 (9th Cir. 2002) ......................... 17

*United States v. Bryan*, 524 U.S. 189, 191 – 192 (1998) ............................................ 7

*United States v. Mendoza*, 244 F.3d 1037 (9th Cir. 2001) ........................................ 10

*United States v. Ramirez-Martinez*, 273 F.3d 903 (9th Cir. 2001) ............................ 9

*United States v. Young*, 470 U.S. 1, 18-19 (1985) ..................................................... 16

**Statutes**

18 U.S.C. §31(a)(3) ....................................................................................................... 2, 4

18 U.S.C. §32(a)(2) ................................................................................................. 2, 3, 12

**Rules**

Crim. P. Rule 29 ............................................................................................................... 1

Fed. R. Crim. P. Rule 29(d)(1) ......................................................................................... 1

Fed. R. Crim. P. Rule 33 ................................................................................................... 1

**Constitutional Provisions**

Fifth Amendment to the United States Constitution ..................................................... 3

Sixth Amendment to the United States Constitution .................................................... 3

# I.  INTRODUCTION

Defendant Ibrahim hereby moves for a new trial pursuant to Fed. R. Crim. P. Rule 33; defendant has also moved for a judgment of acquittal on each count under Fed. R. Crim. P. Rule 29, and believes that motion should be granted. Defendant requests pursuant to Fed. R. Crim. P. Rule 29(d)(1) that this Court "conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed."

# II.  RULE 33

Fed. R. Crim. P. Rule 33(a) provides in relevant part "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."

# III.  INSTRUCTION 33 IMPROPERLY INSTRUCTED THE JURORS THAT, AS A MATTER OF LAW, EACH SUBSTANCE ALLEGED IN THE FIRST NINE COUNTS TO BE A "DESTRUCTIVE SUBSTANCE" WAS IN FACT A DESTRUCTIVE SUBSTANCE.

## A.  THE ALLEGATIONS OF COUNTS 1 THROUGH 9

Paragraph 21 of the Superseding Indictment reads

> On or about June 4, 2010, in the Northern District of California, the defendants, MEDCHEM CORPORATION, and HASAN IBRAHIM did willfully attempt to cause to be placed in, upon, and in proximity to a civil aircraft used, operated, and employed in foreign air commerce, a destructive substance as set forth below, and otherwise cause such aircraft to be made hazardous to use, likely endangering the safety of such aircraft:
> [chemicals listed for counts 1 through 9]
> All in violation of 18 U.S.C. §§ 32(a)(2) and (a)(8)

## B. THE STATUTE INSOFAR AS IT WAS CHARGED

Since "destructive device or substance" is defined at 18 U.S.C. §31(a)(3), the statute can be read by including that definition in 18 U.S.C. §32(a)(2):

> (a) Whoever willfully- (2) places or causes to be placed a [an explosive substance, flammable material, […] or other chemical […] matter of a combustible, contaminative, corrosive, or explosive nature] in, upon, or in proximity to […] any such aircraft […] if such placing or causing to be placed or such making or causing to be made is likely to endanger the safety of any such aircraft; (8) […] shall be fined under this title or imprisoned not more than twenty years or both.

## C. INSTRUCTION 33 DIRECTED THE JURORS TO FIND THAT EACH CHEMICAL LISTED IN COUNTS ONE THROUGH NINE WAS IN FACT A DESTRUCTIVE SUBSTANCE IN VIOLATION OF THE DEFENDANT'S RIGHTS UNDER THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

Instruction 33 read, in part, "First, the defendant intended to cause the following destructive substances to be placed in, upon, or in proximity to an aircraft…" Doc. 151 page 35.

This was immediately followed by a chart with two headings – "COUNT" and "DESTRUCTIVE SUBSTANCE." In the "COUNT" column, the numerals 1 through 9 appeared. In the "DESTRUCTIVE SUBSTANCE" column, the name of a chemical alleged to be a destructive substance was set forth opposite the number of the relevant count.

To take Count 5 as an example, the jurors should have been instructed that to find the defendant guilty it had to find, *inter alia*, First that the defendant intended to cause sodium hydride to be placed in, upon or in proximity to an aircraft, Second, that sodium hydride was a destructive substance.

Instead, the jurors were informed that as a matter of law, sodium hydride was a destructive substance.

1    Directing the jurors to find that, as to Count 1, chloroacetonitrile was a

2   "destructive substance," or, as to Count 5, sodium hydride was a "destructive

3   substance" violated the defendant's rights under both the Fifth Amendment to the

4   United States Constitution and the Sixth Amendment to the United States

5   Constitution.

6    "[T]he Due Process Clause protects the accused against conviction except

7   upon proof beyond a reasonable doubt of every fact necessary to constitute the crime

8   with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970)

9

10    The Sixth Amendment provides that "[i]n all criminal prosecutions, the
      accused shall enjoy the right to a speedy and public trial, by an
11    impartial jury. . . ." In *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968),
      we found this right to trial by jury in serious criminal cases to be
12    "fundamental to the American scheme of justice," and therefore
      applicable in state proceedings. The right includes, of course, as its
13    most important element, the right to have the jury, rather than the
      judge, reach the requisite finding of "guilty." [citation omitted] ***Thus,***
14    ***although a judge may direct a verdict for the defendant if the evidence***
      ***is legally insufficient to establish guilt, he may not direct a verdict for***
15    ***the State, no matter how overwhelming the evidence.***

16   *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993), emphasis added.

17    Because Instruction 33 violated defendant Ibrahim's rights under the both

18   the Fifth and Sixth Amendments, a new trial must be granted on Counts 1 through

19   9.

20      **IV. THE INSTRUCTIONS ON COUNTS 1 THROUGH 9 FAILED TO**
21   **ADEQUATELY DEFINE "LIKELY TO ENDANGER THE SAFETY OF ANY SUCH**
        **AIRCRAFT"**

22      **A.  THE ROLE OF "LIKELY TO ENDANGER THE SAFETY OF ANY**
23        **SUCH AIRCRAFT" IN DEFINING A VIOLATION OF 18 U.S.C.**
               **§32(a)(2)**

24    18 U.S.C. §32(a)(2) provides

25

(a) Whoever willfully- (2) places or causes to be placed a destructive device or substance in, upon, or in proximity to, or otherwise makes or causes to be made unworkable or unusable or hazardous to work or use, any such aircraft, or any part or other materials used or intended to be used in connection with the operation of such aircraft, if such placing or causing to be placed or such making or causing to be made is likely to endanger the safety of any such aircraft; (8) […] shall be fined under this title or imprisoned not more than twenty years or both.

Because a "destructive substance" is defined as, among other things, "flammable material, […] or other chemical […] matter of a combustible, contaminative, corrosive, or explosive nature" (18 U.S.C. §31(a)(3)), it is impossible to board an airplane without willfully placing a destructive substance in an airplane.

Because every passenger can be counted on to have "willfully … cause to be place[d] … in … [an] aircraft" a newspaper (flammable material), a cell phone, lap top computer or other device with a lithium ion battery (combustable and explosive material)[1] or, at a minimum, clothing (flammable material), the gravamen of the offense is not the simple introduction of a "destructive substance,"

The gravamen of the offense is the introduction of a "destructive substance" which "is likely to endanger the safety of any such aircraft."

---

[1] "A potential shortcoming of Li-ion batteries is their flammable electrolyte solutions. Unlike other common types of batteries, in which the electrolytes consist of aqueous solutions of acid or base, the electrolyte in Li-ion cells typically consists of lithium salts in flammable organic solvents such as ethylene carbonate and ethyl methyl carbonate. […] In rare circumstances, some process could internally or externally short-circuit the battery or subject it to abusive electrical conditions or other trauma. According to Daniel H. Doughty of Battery Safety Consulting in Albuquerque, N.M., those events could generate a lot of heat inside the cell, ignite the liquid, or rapidly raise its vapor pressure until the cell bursts." Mitch Jacoby, Assessing The Safety Of Lithium-Ion Batteries, Chemical and Engineering News, February 13, 2013

## B.  INSTRUCTIONS DEFINING "WILLFULLY" IN THE CONTEXT OF 18 U.S.C. §32(a)(2) WERE ERRONEOUS

### 1.  INTRODUCTION

Because there is nothing unlawful about introducing a "destructive substance" onto an aircraft unless, and only if, the substance is "likely to endanger the aircraft, the Court should have given the instruction on willfulness proffered by the defendant.  That instruction would have required the jurors to find that the defendant acted willfully only if it found he had "knowledge that his conduct was likely to endanger the safety of the aircraft."

### 2.  THE PARTIES' PROPOSED INSTRUCTIONS

The government proposed, Doc. 86, page 45

For Counts One through Nine, a person acts "willfully" if he acted with a bad purpose or knowledge that his conduct was wrongful or unlawful. However, the person does not need to be aware of the specific law or rule that his conduct may be violating.

The defendant, on the other hand, at Doc 83, page 6, proposed

For Counts One through Nine, a person acts "willfully" if he acted with a bad purpose and knowledge that his conduct was likely to endanger the safety of the aircraft. However, the person does not need to be aware of the specific law or rule that his conduct may be violating.

The defendant argued that the government's proposed definition of "willfully" in the context of 18 U.S.C. §(a)(2) was too broad. "A person may board an airplane completely oblivious to the fact that he has a destructive substance in his carryon luggage, and yet he would be acting "willfully" under this instruction if he boarded the airplane for a bad purpose wholly unrelated to the destructive substance." Doc. 83,  p.2

### 3.  THE COURT'S INSTRUCTION

In Doc. 114 40:4 – 9, the Court announced this instruction on the question of willfulness in the context of 18 U.S.C. §(a)(2):

> For Counts One through Nine, a person acts "willfully" if he acted with a bad purpose. Thus, the government must show that the person knowingly placed what he knew was a destructive device or substance in, upon, or in proximity to an aircraft. The government must prove that the person knew that this conduct was unlawful, but need not prove the person was aware of the specific law or rule that his conduct violated. The government need not show that the person knew that the plane would be endangered by his actions.[2]

The Court rejected the defendant's proposed instruction.

> Defendants' argument that the government must show that his conduct was likely to endanger the aircraft is not supported by the statutory text. The statute reads:
>
> > Whoever willfully . . . places or causes to be placed a destructive device or substance in, upon, or in proximity to, or otherwise makes or causes to be made unworkable or unusable or hazardous to work or use, any such aircraft, or any part or other materials used or intended to be used in connection with the operation of such aircraft, if such placing or causing to be placed or such making or causing to be made is likely to endanger the safety of any such aircraft
>
> 18 U.S.C. § 32(a)(2). The word "willfully" modifies the placement of the substance on the aircraft, not the likelihood of endangering the safety of the aircraft. Defendants' reading of the "willfully" requirement to require knowledge that his conduct would likely endanger the aircraft is thus not supported by the statute, and Defendants cite no authority interpreting the statute in this manner.

Doc. 114 40:17 – 26

On the other hand, the Court also rejected the government's proposed instruction.

> The government's proposed instruction would allow the government to show willfulness if it proved that a person "acted with a bad purpose or knowledge that his conduct was wrongful or unlawful."

---

[2] This is the instruction given to the jurors.  Doc. 151 p. 38

(emphasis added). This, however, is not an accurate statement of the law. *Bryan* treats "knowledge that conduct was unlawful" as an explanation of the requirement that the actions be taken with "bad purpose," not as an alternative:

> As a general matter, when used in the criminal context, a "willful" act is one undertaken with a "bad purpose." In other words, in order to establish a "willful" violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful.

524 U.S. at 191-92. Thus, the Court finds that the two phrases should not be presented as alternative ways to show willfulness.

Doc. 114 41:27 – 42:8

The Court's reason for rejecting the defense's proffered instruction cannot be reconciled with the Court's reason for rejecting the government's proposed instruction.

### 4. THE COURT'S REASON FOR REJECTING THE DEFENDANT'S PROFFERED INSTRUCTION CANNOT BE RECONCILED WITH THE COURT'S REASON FOR REJECTING THE GOVERNMENT'S PROPOSED INSTRUCTION

The defendant certainly agrees with the Court's adoption of the language in *United States v. Bryan*, 524 U.S. 189, 191 – 192 (1998), quoted at Doc. 114 42:5 – 6, that "the Government must prove that the defendant acted with knowledge that his conduct was unlawful."

However, the introduction of a "destructive substance" onto an aircraft is unlawful *only* if the "destructive substance" is "likely to endanger the safety of the aircraft."

Therefore, a person's knowledge that his "conduct was unlawful" within the meaning of 18 U.S.C. §32(a)(2) is entirely dependent upon his knowledge that the substance was "likely to endanger the safety of the aircraft."

"[W]e must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other

provisions of the same statute inconsistent, meaningless or superfluous." *Boise Cascade Corp. v. EPA*, 942 F.2d 1427, 1432 (9th Cir. 1991).

To say that "[t]he word "willfully" modifies the placement of the substance on the aircraft, not the likelihood of endangering the safety of the aircraft" is to arbitrarily split the statute in half, and render the heart of the statute – the likely endangerment of the aircraft – meaningless in terms of identifying the *mens rea* required to find a violation of the statute.

In short, whether it is a passenger boarding with a newspaper and a lap top battery, or a chemical company shipping Oxalyl Chloride (Count 3), N, N-Dimethylformamide Dimethyl Acetal (Count 4), Sodium Hydride (Count 5), 3.0 N HCL in n-Butanol (Count 6),  Chloroacetophenone (Count 7), 2-Ethoxyethanol (Count 8) or Acetonitrile (Count 9) by air, there is absolutely nothing illegal about the placement of these items on an aircraft.

The only way the introduction of these materials becomes illegal is if the introduction of the materials "is likely to endanger the safety of any such aircraft."

Therefore, the only way that the "the Government [can] prove that the defendant acted with knowledge that his conduct was unlawful" is prove that the defendant knew his introduction of the relevant substance was "likely to endanger the safety of any such aircraft."

The jurors should have been so instructed.

### 5. THE NECESSITY TO DEFINE "WILLFULLY" AS INCLUDING KNOWLEDGE THAT THE SUBSTANCE WOULD LIKELY ENDANGER THE SAFETY OF AN AIRCRAFT IS EVEN MORE PREJUDICIAL WHERE, AS HERE, THE DEFENDANT IS CHARGED UNDER 18 U.S.C. §32(a)(8) WITH AN ATTEMPT

An attempt to commit a crime has the additional element of requiring the specific intent to commit the underlying crime. *United States v. Ramirez-Martinez*, 273 F.3d 903 (9th Cir. 2001)

The underlying crime cannot be committed without a likely endangerment of the safety of an aircraft, and therefore a defendant cannot be guilty of attempting to violate 18 U.S.C. §32(a)(2) without intending to likely endanger the aircraft.

The Court should have instructed the jurors that in order to convict the defendant of violating 18 U.S.C. §32(a)(8) by attempting to violate 18 U.S.C. §32(a)(2), it had to find that the defendant intended to endanger the aircraft.

### C. THE INSTRUCTION DEFINING "ENDANGER" WAS ERRONEOUS

The Court instructed the jurors that "For Counts One through Nine, to "endanger" means to bring into danger or peril of probable harm or loss, to imperil, or to create a dangerous situation. Endangerment does not require proof that the aircraft or anyone aboard the aircraft was actually harmed." Doc. 151 p. 39

This was the instruction proposed by the government. Doc. 86, p 46

The defendant objected to the instruction, arguing

> Defendants' proposed instruction 39 simply excises the phrase "or to create a dangerous situation."
> In the first place, to say "endanger" means to "create a dangerous situation" is tautology which offers no guidance.
> More importantly, offering that phrase disjunctively with "to bring into danger or peril of probable harm or loss" completely eviscerates that requirement.
> Everything can be seen as dangerous, but not everything creates a "danger … of probable harm or loss."

1  Doc. 83 2:20 – 3:2

2      The Court rejected defendant's objections, noting that the government's

3  proposed instruction was based upon *United States v. Mendoza*, 244 F.3d 1037 (9th

4  Cir. 2001), "where the court noted that 'The ordinary meaning of the term

5  "endanger" as used in this context is "to bring into danger or peril of probable harm

6  or loss: imperil or threaten to danger ...: to create a dangerous situation."' Id. at

7  1042." Doc. 114 43:11 – 13

8      *Mendoza* involved a prosecution for "willfully communicating information,

9  knowing the information to be false and under circumstances in which such

10  information may reasonably be believed, thereby endangering the safety of an

11  aircraft in flight in violation of 18 U.S.C. § 32(a)(6)."[3] *Id* at 1042.

12      The *Mendoza* Court said, at 1042  -- 1043.

13
14      Statutory interpretation begins with the plain language of the
      statute. *United States v. Hanousek*, 176 F.3d 1116, 1120 (9th Cir.
15      1999). If the text of the statute is clear, this court looks no further in
      determining the statute's meaning. See Id. Because the statute does
16      not define "endangering, " "we `start with the assumption that the
      legislative purpose is expressed by the ordinary meaning of the words
17      used.' " Id. (quoting *Russello v. United States*, 464 U.S. 16, 21 (1983))
      (quoting *Richards v. United States*, 369 U.S. 1, 9 (1962)).
18      The ordinary meaning of the term "endanger" as used in this
      context is "to bring into danger or peril of probable harm or loss:
19      imperil or threaten to danger...: to create a dangerous situation."
      Webster's Third New International Dictionary (unabridged) 748
20      (1961); see also Black's Law Dictionary 547 (7th ed. 1999) (defining
      "endangerment" as the "act or an instance of putting someone or
21      something in danger; exposure to peril or harm"). Cases interpreting
      the term provide a similar definition. See *Price v. United States Navy*,
22      39 F.3d 1011, 1019 (9th Cir. 1994) (holding, in the context of the
      Resource Conservation and Recovery Act, that endangerment "means a
23      threatened or potential harm and does not require proof of actual
      harm"); *Marchese v. United States*, 126 F.2d 671, 674 (5th Cir. 1942)
24

25  [3] This is now 18 U.S.C. §32(a)(7)

(defining, in the context of the Espionage Act, the phrase "endanger the safety" to "cover cases where no specific injury was done or intended, but only a dangerous condition created"). We find nothing in the legislative history that dictates a different result and, therefore, presume that Congress intended its words to have their ordinary meaning.

In the first place, if the meaning of "endanger" is "plain" and "clear," then the utility of defining it in the first instance is questionable.

However, defendant contends that the meaning of "likely to endanger," as a phrase, is not intuitively obvious.

If the Court is going to define "endanger," it implies that the Court believes a definition is necessary and helpful.

That being the case, to define "endanger" as to "create a dangerous situation" is in no way helpful.

Having advised the jurors that "'endanger' means to bring into danger or peril of probable harm or loss," offering the jurors that alternative ("or") definition – "to create a dangerous situation" – completely negates the first definition.

If a juror was not satisfied beyond a reasonable doubt that a substance brought onto an aircraft created a danger of probable harm or loss, but did believe that in some nebulous manner it must have created a dangerous situation, whatever that might mean, the juror would be authorized by this instruction to find that the substance "endangered" the aircraft.

This was especially prejudicial where, as here, the government's expert, Mr. Blake was specifically asked whether he could say any substance alleged in Counts 1 through 9 would "bring [an aircraft] into danger or peril of *probable* harm or loss." This question, based on Instruction 36, resulted in an answer by Mr. Blake that he could not say that.

However, by offering as an alternative to the definition of "endanger" relied upon by defendant the tautological "create a dangerous situation," the jurors are actually free to divine any definition of endanger/dangerous that pleases them.

The defendant's proffered instruction should have been given.

## D. THE DEFENDANT'S PROFFERED DEFINITION OF "LIKELY" SHOULD HAVE BEEN GIVEN

The defendant proffered an instruction defining "likely" as " very probably," relying on the definition of "likely" as "having a high probability of occurring or being true : very probable <rain is likely today>" from http://www.merriam-webster.com/dictionary/likely. Doc 83 p. 8

The government objected on the basis that it was unnecessary to define "likely," and the defendant counter – proposed the actual dictionary definition: "having a high probability of occurring or being true." Doc. 94 8:18 – 9:5

The Court declined to give any definition of "likely."

## E. EACH INSTRUCTIONAL ERROR COMPELS GRANTING A NEW TRIAL ON COUNTS 1 THROUGH 9, AND THE COMBINED EFFECT OF THE ERRORS COMPELS GRANTING A NEW TRIAL ON COUNTS 1 THROUGH 9

The jurors should have been clearly told that in order to find the defendant guilty of attempting to violate 18 U.S.C. §32(a)(2), it had to find that he willfully attempted to introduce a substance which he knew likely endangered the aircraft.

They were never told this.

## IV. PROSECUTORIAL MISCONDUCT COMPELS THE GRANTING OF A MOTION FOR NEW TRIAL ON ALL COUNTS

## A. INTRODUCTION

The government knew at all times that MedChem was a corporation, and as such a different entity than defendant; furthermore, the government knew that

MedChem acted not solely through the acts of defendant Ibrahim, but also through his son and through WAOS.

Paragraphs 1 and 2 of the Superseding Indictment alleged

> 1. MEDCHEM CORPORATION was a business located at 430 North Canal Street, Unit #5, South San Francisco, California ("MEDCHEM"). MEDCHEM was in the business of exporting chemicals (including hazardous materials), medical equipment, and diagnostics to Constant Trading Activity ("CTA"), a business in Saudi Arabia.
>
> 2. HASAN IBRAHIM ("IBRAHIM") was the owner and president of MEDCHEM. *Until one of his sons became involved in MEDCHEM prior to June 2010* IBRAHIM was MEDCHEM's sole employee. (emphasis added)

In spite of the fact that the prosecution not only knew that MedChem acted through Hasan Ibrahim, his son and WAOS, but included his son's role in the indictment, the prosecution's opening statement claimed that MedChem had only one employee, that the defendant had personal knowledge of every aspect of the relevant shipment, personally authorized the shipment on an airplane of the seized shipment, and affirmatively represented that the shipment did not have any hazardous materials.

As the trial progressed, it became obvious that not only were none of these statements true, but that the government had no good faith belief to assert that they were true.

Nevertheless, in its closing argument, the prosecution redoubled its efforts to say that MedChem and defendant Ibrahim were identical, and that if MedChem was guilty of any offense, the jurors should convict defendant Ibrahim.

In its closing argument, the government argued that MedChem "was a one-man show." The government argued that defendant Ibrahim was "a pro," and that

the person responsible for the shipment was defendant Ibrahim. "He's the guy driving the train."

Furthermore, the government's closing argument repeatedly urged the jurors to consider Exhibit 524 as proof that the defendant was lying to WAOS about whether or not there were hazardous materials in the relevant shipment, even though Mr. Yee had testified unequivocally that Exhibit 524 *had nothing to do with* hazardous shipments, and was solely for the purpose of obtaining Saudi Arabian approval of off – loading the shipment once it reach Saudi Arabia.

## B.  THE PROSECUTION'S CONFLATION OF MEDCHEM AND DEFENDANT IBRAHIM WAS INTENTIONAL

On June 20, 2013, at 11:07 a.m., the government filed what purported to be a Notice of Dismissal as to defendant MedChem. Doc. 132  This was less than two court days before trial was set to commence.  Defendant's Ibrahim and MedChem objected to the dismissal during a further pretrial conference on June 20, 2013 at 1:00 p.m.

Defendant MedChem objected to the dismissal (Doc 135), however the Court granted the government's motion to dismiss MedChem (Doc 134) on June 21, 2013 (Doc. 137).

Why did the government move to dismiss as against MedChem?

The government moved to dismiss against MedChem so that it could improperly attribute any misconduct by MedChem to defendant Ibrahim.  This was a conscious, planned and improper strategy by the government.  When defendants objected to the dismissal, the government filed a motion to dismiss in which it offered the Court no reason for its desire to dismiss as against MedChem on the eve

of trial; the government was "simply exercising its prosecutorial discretion to proceed against Hasan Ibrahim individually." Doc. 134 2:23 – 24.

That prosecutorial discretion was nothing less than a plan evidenced from the opening statement through the rebuttal closing argument to misstate the facts and law to the jurors in order to make the jurors believe that if MedChem did something, defendant Ibrahim was legally responsible.

## C.  THE GOVERNMENT PERSISTED IN MISCHARACTERIZING EXHIBIT 524

Exhibit 524 was an email with three attachments.

The first page of Exhibit 524 explains the purpose of the email.  "Dear Jimmy, Please open the attachments and you will find the three Invoices to b (sic) Legalized."

On cross – examination, Mr. Yee was specifically asked what he understood "you will find the three Invoices to b (sic) Legalized" to mean.  He explained that he understood that the documents attached to the email were for the purpose of going to the Saudi Arabian consulate to get stamps allowing the shipment to be off – loaded when it arrived there.

In its redirect examination of Mr. Yee, the government again asked about Exhibit 524 and its relationship to hazardous materials, and Mr. Yee unequivocally stated that the sole purpose of Exhibit 524 was to obtain the necessary stamp from the Saudi Arabian consulate, and that Exhibit 524 had *nothing* to do with the shipment of hazardous materials.

Nevertheless, the government repeatedly stated to the jurors in its closing argument that Exhibit 524 established that defendant Ibrahim was lying to Mr. Yee about the seized shipment.

### D.  THE GOVERNMENT'S EFFORT TO CONFLATE MEDCHEM AND DEFENDANT IBRAHIM, AND MISCHARACTERIZE EXHIBIT 524, WAS MISCONDUCT

The government's intentional misstatement of fact and law concerning the relationship of MedChem and defendant Ibrahim, and the nature of Exhibit 524, was misconduct compelling a new trial.  *Sechrest v. Ignacio*, 549 F.3d 789, 808 (9th Cir. 2008); *Miller v. Pate* 386 U.S. 1 (1966); *Hall v. U.S.*, 419 F.2d 582, 587 (5th Cir. 1969); *Cargle v. Mullin*, 317 F.3d 1196, 1218 (10th Cir. 2003); *Sechrest v. Ignacio*, 549 F.3d 789 (9th Cir. 2008); *Cheney v. Washington*, 614 F.3d 987 (9th Cir. 2010).


> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all, and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the two-fold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor -- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
>
> It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused, when they should properly carry none.

*Berger v. United States*, 295 U.S. 78, 88  (1935), overruled on other grounds, *Stirone v. United States*, 361 U.S. 212 (1960)

A "prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18-19 (1985)

It is certainly within the bounds of fair advocacy for a prosecutor, like any lawyer, to ask the jury to draw inferences from the evidence that the prosecutor believes in good faith might be true. But it is decidedly improper for the government to propound inferences that it knows to be false, or has very strong reason to doubt [...] (the difference between a lawyer "ask[ing" the jury to infer only things that he believed in good faith might be true" and making "factual assertions he well knew were untrue" is "the difference between fair advocacy and misconduct"); *United States v. Udechukwu*, 11 F.3d 1101, 1106 (1st Cir. 1993) ("[i]t is improper to imply reliance on a fact that the prosecutor knows to be untrue"); *United States v. Valentine*, 820 F.2d 565, 566 (2nd Cir. 1987) (finding prejudicial misconduct where "the prosecutor misrepresented, at least implicitly, the substance of the testimony of several grand jury witnesses").

*United States v. Blueford*, 312 F.3d 962, 968 – 969 (9th Cir. 2002)

In this case, the prosecution's persistent assertion that defendant Ibrahim was the sole employee of MedChem at all relevant times, that he was personally responsible for every act taken on MedChem's behalf, and that Exhibit 524 was designed to induce WAOS to ship the seized shipment rather than merely to obtain Saudi approval for offloading the shipment if and when it was shipped created a miscarriage of justice demanding the grant of a new trial.

## V. FAILURE TO GRANT THE DEFENSE A REASONABLE CONTINUANCE REQUIRES THE GRANTING OF A NEW TRIAL ON ALL COUNTS

Notwithstanding the Court's Third Amended Pretrial Order for Criminal Jury Trial and Briefing Schedule, which required, among other things, that not later than May 7, 2013, the government "[s]erve and file a joint exhibit list in tabular form, with [...] a column that describes for what purpose the party will offer the exhibit ..." Doc. 57 2:23 – 26, on May 8, 2013, the government served on the defense 9 binders, with 3,561 pages divided into 549 exhibits. See Doc. 91 – 1, page 2.

These 3,561 pages did not purport to be the exhibits that the prosecution actually intended to enter into evidence, however, as the prosecution continued to assert it was "winnowing" the exhibits.  Furthermore, the prosecution didn't even make an effort to "describe for what purpose" it will offer the exhibits – not surprising given that the government had not decided at that point which exhibits it might actually offer. See Doc. 91.

On May 14, 2013, the defendant noticed a motion to continue the trial date, based upon the government's "document dump" and its continued submission of discovery. See Doc. 92

That motion was denied on May 22, 2013. Doc. 102

On June 20, 2013, the defense asked for just two days to catch up with the onslaught of the government's production of discovery and exhibits;  "In just the last 6 days, the government has sent 16 pages of discovery, including 6 pages today, 9 new exhibits all sent today comprising 52 pages (all of which arrived while I was engaged in a telephonic appearance this afternoon) and a corrected exhibit which arrived at 5:33 p.m., and requests for 83 stipulations, including requests for 17 stipulations which arrived today." Doc. 133 1:23 – 2:2

Even this modest request was denied. Doc. 137

As a result, the defense was unfairly diverted from presenting its defense by the government's tardy and excessive "document dump."  For example, on June 24, 2013, the first day of trial, the government filed its Third Amended Exhibit List which actually added 19 new exhibits. Doc. 140

The defense should have been protected from the dilatory and burdensome practices of the government with respect to these exhibits by excluding the exhibits,

or in the alternative, afforded sufficient time to both prepare to meet the exhibits and engage in the preparation of the defense.

## VI.  THE COMBINATION OF UNAUTHORIZED *EX PARTE* COMMUNICATIONS AND THE DENIAL OF DISCOVERY ON THE QUESTION OF SELECTIVE OR VINDICTIVE PROSECUTION REQUIRES A NEW TRIAL IN THE INTEREST OF JUSTICE

Defendant moved for discovery of certain evidence which would establish selective and vindictive prosecution. Doc. 60 and Doc. 61  The magistrate judge declined to order the requested discovery. Doc. 66

Defendant thereafter filed timely objections to the magistrate judge's denial of his motion (Doc. 69), but his objections were overruled. Doc. 72.

The essence of the defendant's motion was that he was a law – abiding businessman of Palestinian descent and an adherent of the Muslim religion; that he was active in Mosque and that the government had followed him around for no apparent reason for two years and, when his company was investigated for the June 4, 2010 shipment, the government spent an inordinate amount of time discussing his childhood in Jordan, his current views on the Israeli – Palestine question, his religious practices and his affiliations with other Muslims.  The defense noted that there were absolutely no comparable prosecutions under the statutes deployed against the defendant in this case and that most defendants were not subjected to interrogations relative to such unjustifiable prosecution standards as ethnic origin or religion which had no legitimate role in the purported investigation of shipping violations.

Then, on May 14, 2013, the government filed notice of the filing of sealed documents under CIPA. Doc. 90.  This resulted in the following May 21, 2013 order

The government has requested that the Court approve the production to the defense of an unclassified substitution of classified information identified in connection with this case. After a careful independent, ex parte, in camera review of the materials submitted by the government and based on the entire record in this case, the Court finds that the government's proposed unclassified substitution satisfies the government's discovery obligations.

The Court further finds that classified information provided as an Exhibit to the government's submission implicates the government's national security and classified information privileges because the information is properly classified, is sensitive, and its disclosure could cause serious damage to the national security of the United States. Furthermore, the Court finds that none of the classified information is exculpatory. See Brady v. Maryland, 373 U.S. 83 (1963).

Doc 98 1:26 – 2:8

Defendant thereupon filed a motion to unseal the documents and supply his attorney with copies thereof, even if under a protective order.  Doc. 98

The defendant noted that while there was nothing exculpatory about the "government's proposed unclassified substitution" of discovery, there was also nothing inculpatory.  In fact, the entire process of submitting classified information to the court was transparently pretextual.

The defendant argued then, and argues now, that any information about the defendant which the government claims "could cause serious damage to the national security of the United States" is necessarily both false and substantial evidence of the government's improper purpose in prosecuting him, and, as such, should have been turned over to the defense.

## VII.  CONCLUSION

For the foregoing reasons, the interests of justice compel the granting of a new trial on each count in the Superseding Indictment.

Dated:  July 17, 2013

Respectfully submitted,

James McNair Thompson

Attorney for defendant Ibrahim