JAMES McNAIR THOMPSON
SBN 67807
LAW OFFICES OF JAMES McNAIR THOMPSON
PO BOX 636
LOS GATOS CA 95031
(408) 358-6047
Attorney for defendant Ibrahim

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> HASAN IBRAHIM, <br><br> Defendant. | Case No.: CR – 11—00811 – EMC <br><br> DEFENDANT IBRAHIM'S REPLY TO THE GOVERNMENT'S OPPOSITION TO HIS MOTION FOR A JUDGMENT OF ACQUITTAL UNDER RULE 29 <br><br> DATE:  AUGUST 21, 2013 <br> TIME:  2:30 P.M. <br> DEPT:  COURTROOM 5, 17TH FLOOR <br> HON. EDWARD M. CHEN, PRESIDING |

## Contents

I.  INTRODUCTION ................................................................................................................ 1

II.  THE GOVERNMENT'S SUMMARY OF THE TRIAL ........................................... 1

   A.  DEFENDANT'S PRIOR EXPERIENCE ............................................................. 1

   B.  WHO DELIVERED CERTAIN BOXES TO WAOS? ........................................... 1

   C.  MR. SAMUCHA'S TESTIMONY ...................................................................... 2

   D.  EXHIBIT 524 .................................................................................................... 3

   E.  MR. HERREN'S TESTIMONY ......................................................................... 3

F. THE GOVERNMENT'S ARGUMENT ABOUT DEFENDANT'S RESPONSIBILITY FOR THE JUNE 4, 2010 SHIPMENT ................................... 4

   1. Defendant ordered the hazardous materials for the shipment and directed that those materials be delivered to MedChem and not the freight forwarder ... 5

   2. According to Yee's uncontroverted testimony, defendant delivered the unlabeled boxes containing the hazardous materials to WAOS prior to shipment .................................................................................................................. 5

   3. In a June 4, 2010 email, defendant instructed WAOS to send this shipment by air and provided WAOS with invoices that expressly stated that the shipment did not contain any hazardous substances and grossly understated the cost of the Fisher distiller. (Ex. 524) ............................................................. 6

III. INSUFFICIENCY OF THE EVIDENCE THAT THE DEFENDANT ACTED (WILLFULLY, RECKLESSLY OR OTHERWISE) WITHIN THE MEANING OF EACH COUNT .................................................................................................................. 7

  A. EACH COUNT REQUIRED THAT THE JURORS FIND BEYOND A REASONABLE DOUBT THAT THE DEFENDANT ACTED WITH SOME SPECIFIED STATE OF MIND ........................................................................ 7

  B. THE DEFENDANT DID NOT PERSONALLY OFFER THE BOXES FOR SHIPMENT ................................................................................................. 7

  C. THE GOVERNMENT'S ADMISSION THAT IT CANNOT SAY WHAT THE DEFENDANT'S SON DID OR DID NOT DO WITH RESPECT TO THE SEIZED SHIPMENT COMPELS A JUDGMENT OF ACQUITTAL ON EACH COUNT ..... 8

D. THE EFFECT OF THE GOVERNMENT'S MOTION TO DISMISS AS AGAINST DEFENDANT MEDCHEM ................................................................... 8

IV. THERE WAS INSUFFICIENT EVIDENCE AS TO COUNTS 1 THROUGH 9 AND COUNTS 21 AND 22 THAT THE DEFENDANT TOOK A SUBSTANTIAL STEP TOWARD THE COMPLETION OF OFFENSES ................................................ 9

V. THERE WAS INSUFFICIENT EVIDENCE THAT ANY SUBSTANCE IN COUNTS 1 THROUGH 9 WAS A "DESTRUCTIVE SUBSTANCE" WITHIN THE MEANING OF 18 U.S.C. §32(a)(2) ........................................................................... 10

A. THE MEANING OF "DESTRUCTIVE SUBSTANCE" ..................................... 10

B. CASES DISCUSSING THE MEANING OF "DESTRUCTIVE SUBSTANCE" 11

C. NONE OF THE CHEMICALS SET FORTH IN COUNTS 1 THROUGH 9 IS A "DESTRUCTIVE SUBSTANCE" IN THE CONTEXT OF 18 U.S.C. §32(a)(2) ..... 11

D. THE CHEMICALS IN COUNTS 3 THROUGH 9 CANNOT, AS A MATTER OF LAW, BE A "DESTRUCTIVE SUBSTANCE" WITHIN THE MEANING OF 18 U.S.C. §32(a)(2) ............................................................................................... 11

VII. THE REMAINING ARGUMENTS OF THE GOVERNMENT REST ON THE SAME DISCREDITED CONTENTIONS PREVIOUSLY MADE ............................ 12

VIII. CONCLUSION ................................................................................................ 13

## I. INTRODUCTION

Defendant Ibrahim filed a motion for judgment of acquittal on each count of the Superseding Indictment. (Doc. 158) The government has filed an Amended Opposition to the defendant's motion. (Doc. 169)

## II. THE GOVERNMENT'S SUMMARY OF THE TRIAL

The government's summary of the evidence adduced at trial is at some points overly expansive and at others overly restrictive.

### A. DEFENDANT'S PRIOR EXPERIENCE

The government notes that there was evidence that the defendant had received and shipped numerous items at other, irrelevant, times. From this, the government asserts that the evidence shows he had "knowledge of the rules relating to hazardous materials." (Doc. 169 5:12 – 6:14)[1] The government overlooks the evidence that even its experts, Mr. Blake and Mr. Sanders, each with far more experience in hazardous materials than the government contends was the case with the defendant, and each of whom had specifically prepared to testify in the trial about a limited number of substances, made fundamental errors.

### B. WHO DELIVERED CERTAIN BOXES TO WAOS?

More importantly, however, the government asserts that "[a]ccording to Yee's uncontroverted testimony, defendant delivered the unlabeled boxes containing the hazardous materials to WAOS prior to shipment." (Doc. 169) 7:5 – 6) This is not correct. Yee testified that he did not see every box as it was delivered to WAOS.

---

[1] Defendant uses the pagination of the ECF; for example, the citation above refers to pages 1 and 2 as they appear on the printed motion (due to a table of contents and a table of cases paginated differently), but pages 5 of 13 and 6 of 13 on the ECF version.

Reply to Gov.'s Oppo. to Defendant's Rule 29 Motion          Page 1

1       The shipment consisted of 64 boxes, some of which were delivered by 3rd
2 parties to WAOS and some of which were delivered by MedChem to WAOS. For
3 example, box 64 contained chloroacetonitrile, sulfuryl chloride and oxalyl chloride,
4 which formed the basis for Counts 1, 2 and 3; it also contained benzo[a]pyrene, ethyl
5 cyanoacetate, p-anisidine, phenylhydrazine, and thioglycolic acid, which, together
6 with the chloroacetonitrile, sulfuryl chloride and oxalyl chloride, formed the basis of
7 Counts 10 and 19.
8       Not one witness testified about the identity of the person who delivered Box
9 64 to WAOS, nor when it was delivered.
10       Likewise, not one witness testified as to when, or by whom, box 44 (Counts 9,
11 10 and 12), box 45 (counts 6, 7, 10 and 13), box 46 (counts 8, 10 and 14), box 53
12 (counts 10 and 15), box 54 (counts 10 and 16), box 58 (counts 4, 5, 10 and 17) or box
13 60 (counts 10 and 18) were delivered to WAOS.
14       While it is true that the defendant failed to prove that someone other than
15 him delivered, for example, box 64 to WAOS, it is equally true that the government
16 failed to prove that nobody other than the defendant delivered the box. Given the
17 burden of proof and presumption of innocence, this creates a gap in the chain of
18 evidence which is fatal to the government's case.

### C. MR. SAMUCHA'S TESTIMONY

20       The government argues that "[t]he fact that defendant took hazardous
21 materials out of labeled hazardous materials boxes and repackaged them into
22 unlabeled boxes was corroborated by his friend and office park neighbor, Saul
23 Samucha." (Doc. 169 6:17 – 19) They also claim that "the sulfuryl chloride (Count 2)
24 was transported from Sigma to defendant's neighbor Saul Samucha who signed for
25 the shipment and later turned it over to the defendant." (Doc. 169 7:1 – 2)

If these two statements were supported by the evidence, they still would not support a conclusion that the defendant "took [sulfuryl chloride] out of labeled hazardous materials boxes and repackaged them into unlabeled boxes;" however, they are not supported by the evidence.

Sulfuryl chloride is, among other things, an inhalation hazard, and if shipped according to Sigma's testimony, would have had a warning label stating that it was an inhalation hazard. However, Mr. Samucha testified that while he had seen chemicals with flammable warning labels, he had never seen an inhalation hazard warning label before. Mr. Lovan's testimony that Mr. Samucha signed for a shipment of sulfuryl chloride does not refute Mr. Samucha's testimony, because he also testified that while he sometimes signed for shipments on behalf of MedChem, his warehouseman actually received and delivered the shipments.

### D. EXHIBIT 524

The government does not, as it in good faith could not, deny that Mr. Yee testified that Exhibit 524 was sent to him for the purpose of obtaining the necessary documentation from the Saudi Arabian consulate in order to offload the shipment when it arrived in that country, nor does the government deny that Mr. Yee specifically testified that Exhibit 524 had nothing to do with hazardous materials.

It is therefore distressing that the government continues to attempt to re – characterize the nature of Exhibit 524.

### E. MR. HERREN'S TESTIMONY

The government makes claims about Mr. Herren's testimony which are far too sweeping.[2]

---

[2] Mr. Herren's credibility was less than stellar, in that he was unaware that certain portions of the shipment in question had been sent directly to WAOS, and he misspoke, and had to retract a ~~statement he made on direct examination that he defendant had stated something about shipments~~

>Defendant stated that he repackaged hazardous materials that he received by placing them into boxes without hazardous materials labels, and that he did so to expedite the hazardous materials through Saudi customs. (Herren Testimony). (Doc. 169 6:15 – 17)
>
>Defendant's own admissions further highlight the evidence establishing willfulness – he admitted that he oversaw the preparation of this shipment and concealed the hazardous materials in unlabeled packaging to expedite their transit through Saudi customs. (Doc. 169 8:24 – 9:2)

What the government overlooks is that, in the first instance, Mr. Herren testified that he had no verbatim statements he attributed to defendant, and he did not specifically recall what words the defendant used. However, Mr. Herren made clear that he had a conversation about both historic shipments generally and the shipment that was seized. With respect to the latter, Mr. Herren testified that the defendant told him that his son had prepared most of the shipment, that Mr. Ibrahim said he oversaw the shipment, but that Mr. Herren did not understand what Mr. Ibrahim meant by that. Evidently, Mr. Herren did not follow up on this issue to clarify what Mr. Ibrahim meant.

### F. THE GOVERNMENT'S ARGUMENT ABOUT DEFENDANT'S RESPONSIBILITY FOR THE JUNE 4, 2010 SHIPMENT

The government argues that the defendant's "direct and personal responsibility for the charged shipment came from, among others, the following acts …" (Doc. 169 2:21 – 22)

---

being cheaper. Nevertheless, even affording Mr. Herren full credibility, his testimony does not amount to a thing.

### 1. Defendant ordered the hazardous materials for the shipment and directed that those materials be delivered to MedChem and not the freight forwarder

Even viewed abstractly, the acquisition of the chemicals seems irrelevant to a charge of regulatory violations in the shipping of the chemicals; they are simply too separate aspects of the business.

However, it is an even more untenable basis for a conviction for violation of shipping regulations where, as here, prior acquisitions and shipments in compliance with regulations were introduced by the government to prove that the defendant had some familiarity with hazardous shipping regulations.

The defendant had been in the business of obtaining and shipping materials for years, and therefore had "ordered hazardous materials" on a number of other occasions. Mr. Yee testified that he opened 20% of all packages delivered to WAOS for shipment to inspect them, and not once did MedChem's shipments ever disclose any irregularity. MedChem, and Mr. Ibrahim, had obviously been the subject of interest by the FBI for some period of time, and yet the government never uncovered any shipping irregularity until the June 4, 2010 shipment, which occurred shortly after defendant's son began working with MedChem according to Mr. Yee, Mr. Ming and Mr. Samucha.

Likewise, the government's argument that in the ordering process, the defendant was advised of which materials were hazardous, or that they were received at MedChem suggests anything different than occurred for years before the one non-compliant shipment.

### 2. According to Yee's uncontroverted testimony, defendant delivered the unlabeled boxes containing the hazardous materials to WAOS prior to shipment

As we have seen, this is inaccurate.

**3. In a June 4, 2010 email, defendant instructed WAOS to send this shipment by air and provided WAOS with invoices that expressly stated that the shipment did not contain any hazardous substances and grossly understated the cost of the Fisher distiller. (Ex. 524)**

The fact that Mr. Yee testified that Exhibit 524 related only to obtaining Saudi Arabian documents and had nothing to do with how hazardous materials should be shipped has been discussed.

However, it is disturbing that the government further asserts that by this email (Exhibit 524) "defendant instructed WAOS to send this shipment by air …"

The email read
> Dear Jimmy,
> Please open the attachments and you will find the three Invoices to b Legalized.
> Once you receive these Invoices back, please let me know and we would like you to send them to Jeddah immediately and also send with them 30 pieces of the same paper you printed them on.
> Thanks,

In short, the email said "Once you receive these Invoices back, … send them to Jeddah immediately …" In other words, the "them" that defendant asks Mr. Yee to send to Jeddah immediately was the invoices after being processed by the Saudi consulate, not the shipment itself.

This is further confirmed by the fact that defendant instructs Mr. Yee to not only send the invoices but to "also send with *them* 30 pieces of the same paper you printed *them* on."

Not only does the evidence fail to support an inference that the email instructed Mr. Yee to ship by air any packages to Jeddah, but it affirmatively establishes that Mr. Ibrahim was only instructing Mr. Yee to send paperwork to Jeddah.

### III. INSUFFICIENCY OF THE EVIDENCE THAT THE DEFENDANT ACTED (WILLFULLY, RECKLESSLY OR OTHERWISE) WITHIN THE MEANING OF EACH COUNT

#### A. EACH COUNT REQUIRED THAT THE JURORS FIND BEYOND A REASONABLE DOUBT THAT THE DEFENDANT ACTED WITH SOME SPECIFIED STATE OF MIND

The government agrees that it bore the burden of establishing that some act by the defendant was responsible for the improprieties of the shipment, and that his ordering of the materials did not establish this. (Doc 169 8:5 – 13)

#### B. THE DEFENDANT DID NOT PERSONALLY OFFER THE BOXES FOR SHIPMENT

The government begins its argument by noting that there was no testimony that the defendant "personally prepared the boxes that contained the destructive substances." It then argues that "he ordered the hazardous materials with knowledge that materials were hazardous," although it had conceded just 8 lines before that the "fact that he ordered the subject materials, standing alone, would not constitute a violation of the statutes of which he was convicted."

The government continues its argument by claiming that the defendant "delivered the boxes containing those materials to the freight forwarder." This contention has been refuted in II.B and II.F.2 above.

The government concludes its argument with the claim that the defendant "provided the freight forwarder with false information in the emailed invoices about the contents of those boxes and the hazardous nature of certain of the materials." This contention was refuted in II.F.3 above.

In other words, the government's argument that the defendant did an act which caused any of the violations is built upon a point which it concedes is insufficient to establish guilt and two points for which there is no evidence – for which the evidence is contrary to the point the government seeks to make.

### C. THE GOVERNMENT'S ADMISSION THAT IT CANNOT SAY WHAT THE DEFENDANT'S SON DID OR DID NOT DO WITH RESPECT TO THE SEIZED SHIPMENT COMPELS A JUDGMENT OF ACQUITTAL ON EACH COUNT

The government argues that defendant had claimed "that because the government could not establish exactly what role the son played in connection with the subject shipment, the defendant is automatically not guilty." (Doc. 169 9:7 – 8)

Defendant has not attempted to introduce a new legal concept of "automatically not guilty."

Defendant simply noted that where the government had the burden of proof on the question of who prepared the shipment, and who delivered the offending boxes (as opposed to properly prepared boxes) to WAOS, and where the government could not say that these things were not done by the defendant's son, it failed in meeting its burden of proving that either or both of these acts were committed by the defendant.

The government in fact seeks to introduce a new legal concept of "automatically guilty" by arguing that since it cannot say who prepared the boxes or delivered them to WAOS, it cannot say whether or not defendant's son aided and abetted him.

### D. THE EFFECT OF THE GOVERNMENT'S MOTION TO DISMISS AS AGAINST DEFENDANT MEDCHEM

The government says that the "evidence presented at trial specifically detailed the personal actions of the defendant in connection the subject shipment" rather than attempting to blame defendant personally for any corporate failings.

However, after advising the jurors that he wanted to discuss the evidence, he told them that MedChem was defendant's business and up until the time of the shipment in question it was a one – man show. The government argued to the

1 jurors that defendant's son wasn't responsible for the shipment, because defendant

2 "was the guy driving the train."

3 All of this was to say that defendant bore the responsibility for any corporate

4 failings regardless of whether he had any personal involvement in them.

### IV. THERE WAS INSUFFICIENT EVIDENCE AS TO COUNTS 1 THROUGH 9 AND COUNTS 21 AND 22 THAT THE DEFENDANT TOOK A SUBSTANTIAL STEP TOWARD THE COMPLETION OF OFFENSES

The government argument that there was sufficient evidence that the defendant took a substantial step toward the completion of the relevant offenses once again relies upon the erroneous claim that the evidence established he delivered the relevant boxes to WAOS and the erroneous claim that Exhibit 524 established the defendant misled WAOS and directed them to "ship the boxes to Saudi Arabia by air." (Doc. 169 10:14)

The government misunderstands the defendant's many discussions about Exhibit 524, saying that "defendant argues that by asking the freight forwarder to 'legalize' the shipment, he relied upon them to follow all rules for shipping hazardous materials." (Doc. 169 10:21 – 22)

Defendant never made this argument.[3]

---

[3] The defendant's argument, at Doc 158 16:17 – 17:7 was :The government proceeded on the theory that the defendant had misled Mr. Yee on the question of the hazardous nature of portions of the shipment by emailing him Exhibit 524.
   However, the first page of Exhibit 524 explains the purpose of the email.
"Dear Jimmy, Please open the attachments and you will find the three Invoices to b (sic) Legalized."
   On cross – examination, Mr. Yee was specifically asked what he understood "you will find the three Invoices to b (sic) Legalized" to mean. He explained that he understood that the documents attached to the email were for the purpose of going to the Saudi Arabian consulate to get stamps allowing the shipment to be off – loaded when it arrived there.
   In its redirect examination of Mr. Yee, the government again asked about Exhibit 524 and its relationship to hazardous materials, and Mr. Yee unequivocally stated that the sole purpose of Exhibit 524 was to obtain the necessary stamp from the Saudi Arabian consulate, and that Exhibit 524 had *nothing* to do with the shipment of hazardous materials. (emphasis in original)

However, the government, having constructed this straw – man, proceeds to impale it with an argument that utterly destroys its credibility on every point it seeks to make. At Doc. 169 10:27 – 11:4, the government admits

> The logical answer, as presented at trial, and argued by the government, is what Mr. Yee, the freight forwarder testified to: what was meant by "legalize" the shipment in the email from the defendant to the freight forwarders was in fact a direction to obtain the proper stamps for entry in Saudi Arabia; it had nothing to do with a direction to properly packaging, labeling, and declaring hazardous material.

This is of course, not merely evident from the plain language of Exhibit 524, but also from the uncontroverted testimony of Mr. Yee that this email had "nothing to do with a direction to properly packaging, labeling, and declaring hazardous material." This is an astonishing admission from a party who has argued on almost every other page that Exhibit 524 was an order to ship the materials, or an attempt to evade "declaring hazardous materials."

While the government rebuts an argument that the defendant never made by admitting that Exh. 524 did none of the things the government elsewhere claims it did, the government fails to address any of the points actually made by the defendant on this issue.

### V. THERE WAS INSUFFICIENT EVIDENCE THAT ANY SUBSTANCE IN COUNTS 1 THROUGH 9 WAS A "DESTRUCTIVE SUBSTANCE" WITHIN THE MEANING OF 18 U.S.C. §32(a)(2)

#### A. THE MEANING OF "DESTRUCTIVE SUBSTANCE"

The point made by defendant, and ignored by the government, is that if every flammable material is a "destructive substance," then the term is meaningless unless it is coupled with the requirement that the substance is "likely to endanger the safety of any such aircraft." 18 U.S.C. §32(a)(2)

## B. CASES DISCUSSING THE MEANING OF "DESTRUCTIVE SUBSTANCE"

The point the defendant was attempting to make when discussing cases defining "destructive substances" was not that unless the precise substance appeared in a reported case it could not be the basis for a prosecution.

The point was that nothing even approaching the quality and nature of the shipment at issue here had been the basis of such a prosecution, and that the reasonable explanation for this is that these materials were not intended to fall within the definition of a "destructive substance … likely to endanger [an] aircraft."

## C. NONE OF THE CHEMICALS SET FORTH IN COUNTS 1 THROUGH 9 IS A "DESTRUCTIVE SUBSTANCE" IN THE CONTEXT OF 18 U.S.C. §32(a)(2)

The government acknowledges that Mr. Blake was unable to say that any of the substances in Counts 1 through 9 would "likely endanger" an aircraft, and then proceeds to argue that the jurors were free to imagine their own quantum of peril and find that the substances would "likely endanger" an aircraft.

There is no merit to this argument, but the government's concession certainly compels the granting of the motion on this point.

## D. THE CHEMICALS IN COUNTS 3 THROUGH 9 CANNOT, AS A MATTER OF LAW, BE A "DESTRUCTIVE SUBSTANCE" WITHIN THE MEANING OF 18 U.S.C. §32(a)(2)

Defendant filed a Motion to Dismiss Counts 2 – 9 for Multiplicity. (Doc. 161)

The government opposed that motion on the basis that the statute referred to "a" substance (Doc. 168 2:26, italicizing the word "a") and that "the individual substances are not part of one complete structure and thus are properly charged separately." (Doc. 168 3:16 – 17)

Here, however, the government abandons its constrictive reading of 18 U.S.C. §32(a)(2) and adopts an expansive reading of the statute, arguing that the statute

does not address substances which are destructive *per se*, but otherwise innocuous substances made hazardous by their packaging (Doc. 166 9:18) and by their "proximity to other hazardous materials." (Doc. 166 9:20)

Count 3 of the Superseding Indictment, however, at Paragraph 21, simply alleges that

> On or about June 4, 2010, in the Northern District of California, the defendants, MEDCHEM CORPORATION, and HASAN IBRAHIM did willfully attempt to cause to be placed in, upon, and in proximity to a civil aircraft used, operated, and employed in foreign air commerce, a destructive substance as set forth below, and otherwise cause such aircraft to be made hazardous to use, likely endangering the safety of such aircraft: Two 25-gram bottles of Oxalyl Chloride within box 64

Since it is lawful to ship oxalyl chloride on an aircraft, the attempted placement on an aircraft cannot be a violation of 32 U.S.C. §32(a)(2), notwithstanding the government's arguments about its proximity to other hazardous materials, or about its packaging.

The government's argument about a hypothetical shipment of 10 liters of acetonitrile in a ziplock sandwich baggy illustrates the problem: presumably Mr. Blake could have testified that this would "likely" endanger an aircraft, testimony he was unable to offer about the materials at issue in this case.

## VII. THE REMAINING ARGUMENTS OF THE GOVERNMENT REST ON THE SAME DISCREDITED CONTENTIONS PREVIOUSLY MADE

The remaining arguments of the government rely on its characterization of Exhibit 524 as a lie to WAOS about the nature of the shipment, and as an order to ship the materials via air to Saudia Arabia forthwith. This is belied by the plain language of the exhibit (see II.F.3 above), by the testimony of Mr. Yee that the exhibit had nothing to do with hazardous shipments or anything other than the obtaining of certain documents from the Saudi consulate, and by the government's

1 own admission – "what was meant by "legalize" the shipment in the email from the
2 defendant to the freight forwarders was in fact a direction to obtain the proper
3 stamps for entry in Saudi Arabia; it had nothing to do with a direction to properly
4 packaging, labeling, and declaring hazardous material." Doc. 169 10:27 – 11:4

This mischaracterization has been dealt with.

## VIII.  CONCLUSION

The defendant is entitled to a judgment of acquittal on each count.

Dated:  August 20, 2013

Respectfully submitted,



James McNair Thompson

Attorney for defendant Ibrahim